UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ELLEN T. HAYNES,

    Plaintiff,

v.                                                                  CASE NO: 8:09-cv-430-T-23AEP

WILDER CORPORATION OF DELAWARE,

    Defendant.
_____/

## **O R D E R**

Ellen Haynes sues for damages and injunctive relief under the Fair Housing Act, 42 U.S.C. § 3601 et seq. (the "FHA"), and for injunctive relief under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA"). The defendant moves (Doc. 23) for summary judgment, and Haynes responds (Doc. 27) in opposition.

### Standard of Review

Summary judgment is proper if the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. A disputed fact is material if the fact "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. The movant bears the burden of establishing the absence of a dispute over a material fact. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993). The evidence and factual inferences from the evidence are construed favorably to the party opposing summary judgment. Reynolds, 989 F.2d at 469.

Factual Background

I. The Parties

The defendant owns and operates several "RV Resorts," including the Rice Creek RV Resort ("Rice Creek") in Riverview, Florida. Rice Creek consists of "573 full hookup, shaded sites" for installation of either a mobile home or an RV. Rice Creek rents the sites at a daily, weekly, monthly, or yearly rate. The defendant advertises Rice Creek as an "adult travel resort" located "within minutes of the Suncoast's major attractions." The Rice Creek web site lists "features" available at the resort, which features include "planned activities," "golf courses nearby," "men's and ladies' lounges," "heated swimming pool," "2 hot whirlpools," "10 shuffleboard courts (professional style)," "15,000 sq. ft. clubhouse," "craft room," "computer room," "pool room," "laundry," "exercise room," "library," and "wireless internet service." During the relevant period, Carol and Steve Sanchez managed the Rice Creek resort.

The plaintiff, Ellen Haynes, has lived at Rice Creek since April, 2006. In February and March, 2007, Haynes underwent two surgeries to repair a herniated disc in her back. The surgeries proved unsuccessful, and Haynes continues to suffer from severe back pain. Although Haynes can walk approximately ten steps, walking exacerbates the pain. Accordingly, Haynes spends most of her time in a wheelchair. Due to her back pain, Haynes struggles to open the door to the Rice Creek management office. To accommodate Haynes, either a Rice Creek employee or a neighbor typically holds the door open for Haynes when she comes to the office to pay her rent or her electric bill.

A group of residents at Rice Creek formed the Rice Creek Park Association (the "Neighborhood Association"), which plans social activities for Rice Creek residents.

Although unincorporated, the Neighborhood Association maintains a checking account and elects both an executive board and an officer who serves as a "liaison" between the Neighborhood Association and Rice Creek management. A resident becomes eligible for a voluntary membership in the Neighborhood Association after living at Rice Creek for two months. The Neighborhood Association organizes many of the "planned activities" for residents of Rice Creek, which activities the defendant advertises both on the defendant's web site and in the common areas of the clubhouse.

Haynes asserts that the Neighborhood Association serves the defendant as an agent responsible for implementing the "planned activities." Haynes argues that the planned activities benefit the defendant's recruitment of new residents and that the defendant prominently advertises the planned activities in the literature for Rice Creek. Furthermore, Haynes alleges that the defendant "controls the undertakings" of the Neighborhood Association. For evidence of the defendant's control over the Neighborhood Association, Haynes cites the deposition of Bill Brimmer, the current manager of Rice Creek. At the deposition, Haynes's lawyer asked how Brimmer would respond to a series of hypothetical situations, such as the Neighborhood Association's leaving a mess in the clubhouse or sponsoring dangerous or illegal activity. Brimmer predicted that he would respond to the hypothetical situations by speaking with the liaison officer or the president of the Neighborhood Association to resolve the problem.

Deborah Reese, the "divisional parks manager" for the defendant, testified that the defendant encourages the Neighborhood Association to establish a "crime watch" and that "if the residents come in and have a function, they clean up their mess when they're done." (Doc. 32 at 25) Haynes's lawyer also asked Reese how she would respond in the

hypothetical event that the Neighborhood Association "was doing something illegal in the common area." (Doc. 32-1 at 1)  Reese predicted that she would direct the Rice Creek management not to allow the Neighborhood Association to conduct illegal activity on the Rice Creek property.  Finally, Haynes's lawyer asked," What if the park association was doing something dangerous on the premises like—this is not something that would happen but a park association [liaison] decides to have a bungee jumping apparatus in the common area and they say that's going to be our Friday activity[?]" (Doc. 32-1 at 1)  Reese predicted that she would prohibit the Neighborhood Association's constructing a bungee jumping apparatus on the property.  Reese remained concerned that the defendant, as the owner of the property, might incur liability if someone sustained an injury while bungee jumping.

## II. Billiards and Bingo

The Rice Creek clubhouse contains a billiards room, and the Neighborhood Association owns the billiards tables and billiards equipment.  (Doc. 24 at 9)  Any member of the Neighborhood Association may use the billiards room and billiards equipment.  Until 2009, a member of the Neighborhood Association, Frederick Burkheiser, organized a men's billiards tournament in the Rice Creek clubhouse.  In approximately December, 2008, or January, 2009, Haynes entered the men's billiards tournament by listing "E. Haynes" on the sign-up sheet.  Burkheiser allowed Haynes to participate because Haynes had already paid the entry fee.  However, Burkheiser prohibited Haynes from participating in any future, men's billiards tournament.  Several weeks later, Burkheiser rejected Haynes's attempt to enter another billiards tournament.  Burkheiser avers that he offered to help Haynes organize a women's billiards

- 4 -

tournament, but Haynes refused and threatened to sue Burkheiser.  After Haynes threatened suit, Burkheiser ceased organizing the billiards tournaments.  Haynes denies both that Burkheiser offered to help organize a women's tournament and that Haynes threatened to sue Burkheiser.   Burkheiser avers that the defendant "has never had any involvement in the organizing or conducting of the billiards tournaments at Rice Creek."  (Doc. 24 at 9)

The Neighborhood Association also organizes a weekly "bingo night" in the clubhouse.  Shortly after moving to Rice Creek, Haynes began participating in the weekly bingo night.  On a bingo night shortly after Haynes's surgeries, Haynes lost control of her wheelchair and knocked over a table.  After the accident, Jim Ellis, who organized the bingo nights for the Neighborhood Association, reserved a table at the front of the room for bingo players in a wheelchair.  According to Haynes, the next time Haynes arrived to play bingo, Ellis insisted that Haynes sit at the reserved table.  Haynes refused and remained in her favorite spot by the entrance to the kitchen.  According to the defendant, Ellis simply reserved the table for players in a wheelchair because the table offered more space in which to maneuver a wheelchair.  Furthermore, although the handicapped table was "reserved" for persons in a wheelchair, the defendant asserts that Ellis allowed handicapped bingo players to sit in any available seat. The defendant submits several affidavits stating that the defendant "has never had any involvement in the organizing or managing of the bingo nights at Rice Creek."  (Doc. 24 at 4)  On one occasion however, Bill Brimmer asked the residents in charge of the bingo night to "quit using staples to put their bingo papers together. . . . 'Use scotch tape because now we are picking the staples out of the carpet.'" (Doc. 31 at 14-15)

- 5 -

### III. A Confrontation with Management

In August, 2008, Haynes went to the office to obtain her electric bill. Upon concluding her business, Haynes moved toward the door to leave. Haynes asked one of the defendant's employees, Laura Mathis, "[I]s somebody going to come and open this door for me?" (Doc. 25-1 at 6)  Mathis refused and stated that a new corporate policy prohibited her leaving her station behind the rental counter. Frustrated, Haynes said, "[I]f somebody doesn't come open this door for me, . . . I sure as hell will tell Wilder that they will have to supply me with electric doors so I can get in and out of here." Approximately five minutes later, the manager, Carol Sanchez, arrived and opened the door to allow Haynes to leave.

On September 3, 2008, Haynes went to the leasing office to pay her rent. Finding no one at the door, Haynes used her cane to tap lightly on the window. After no one responded to the knock, Haynes wheeled closer to the window and noticed that Steve Sanchez was inside working on a computer. Haynes knocked again, and Sanchez arose and moved toward the door. Opening the door but remaining in the doorway, Sanchez yelled, "I have seen you walk. You can walk in this office if you want. There's no reason you can't. I know what handicapped or disabled is, and you're not. . . . There's no reason that you cannot come in here, and I will not open this door for you again." (Doc. 25-1 at 7)  Sanchez stepped aside and held the door open to allow Haynes to enter. Haynes entered the office, talked briefly with Laura Mathis, and moved her wheelchair toward Sanchez, who had returned to the computer. Haynes attempted to talk to Sanchez, but Sanchez began yelling as soon as Haynes approached. Sanchez screamed that during his service in the Vietnam War, several of his friends died and

several lost a limb. After the second confrontation, Sanchez stood and opened the door to allow Haynes to leave. Haynes left the office and went home to cry.

### IV. Haynes's Requests for Accomodation

After several unsuccessful attempts to complain to the defendant's corporate office about Sanchez's behavior, Haynes hired a lawyer. A September 29, 2008, letter from Haynes's lawyer informs the defendant that Haynes is "handicapped" within the meaning of the FHA and states:

> [You are] required to grant Ms. Haynes the reasonable accommodation of: opening the door to the office for her when she comes to use it, installing handicap accessible doors, or otherwise make the office and common areas accessible to her. I trust that this request will be granted as of October 1, 2008, so that Ms. Haynes may pay her rent and receive a receipt for such payment, as has been her practice since approximately 2006.

(Doc. 23 at 23) Since September 29, 2009, no one has denied Haynes access to the leasing office. (Doc. 25-1 at 91)

On December 4, 2008, Haynes's lawyer sent the defendant a second letter requesting the following accommodation for Haynes's handicap:

> **(1) Electric Doors (4)**. One on both sides of the community room, one leading to the billiard room, and one leading to the office.
>
> **(2) Equal access and participation in all community events**. Including but not limited to, billiards tournaments, card tournaments, bingo, and shuffle board.

(Doc. 23 at 22) The letter fails to explain how the defendant denied Haynes "equal access and participation" in the community events. The defendant responded the next day by a letter (Doc. 23 at 28), which acknowledges the first request for an accommodation and states that the defendant opens the door for Haynes when she wants to enter the leasing office. However, the defendant's letter advises Haynes that

- 7 -

the defendant exerts no control over the community events, which remain the responsibility of the "Activities Director of the Park."

On January 7, 2009, Haynes's lawyer sent a third letter requesting that the defendant install an electric door (1) at the entrance to the leasing office, (2) at the entrance to the community room on the north side of the clubhouse, (3) at the entrance to the billiards room on the south side of the clubhouse, and (4) at the entrance to the "smoking area" on the south side of the clubhouse. The letter also requests the defendant to "insure that everyone is allowed equal participation in these community events which take place on Rice Creek RV Resort's property." (Doc. 23 at 31) The defendant responded in a January 27, 2009, letter, which states:

> We have reviewed your client's request for electric/automatic devices at the specific locations with the appropriate installation company.
>
> We can comply with the request for the entrance to the office on the west side of the common building and the entrance to the community room on the north side of the common building as set forth in (1) and (2). The entrance to the billiards room on the south side of the common building set forth in (3) is a problem since the south side door is part of the concrete structure. However, we can install such a device on the west side interior door to the billiards room. The entrance to the "smoking area" on the south side of the common building across from the community room entrance is puzzling since this location and the pool area is accessible without going through any door. Please forward a Release if these three (3) locations are acceptable.
>
> We are enclosing a copy of the website and the monthly newsletter. The website does not set forth any specific events, we only provide the location. The newsletter clearly sets forth the Daily Activities and the person planning and coordinating each activity. Wilder Corporation does not plan or coordinate any events. The appropriate contact person is clearly listed.

(Doc. 23 at 33) Haynes sued on March 11, 2009. On May 20, 2009, the defendant installed two electric doors at Rice Creek—one at the entrance to the leasing office and one at the north entrance to the clubhouse. On July 30, 2009, the defendant installed

- 8 -

two more electric doors—one at the south entrance to the clubhouse and one at the entrance to the billiards room.  Haynes has not entered the billiards room since the installation of the electric doors.  (Doc. 25-1 at 22)

## Discussion

Haynes alleges in count one that the defendant violated the FHA (1) by "making statements evincing a preference against handicap tenants" and (2) by "discriminating in the provision of facilities and services in connection with [Haynes's] dwelling based on sex and handicap." (Doc. 1 at 10)  Haynes alleges in count two that the defendant violated the ADA (1) by refusing "to remove architectural barriers of non-handicap accessible doors" and (2) by refusing "to insure equal participation in RV Resort Activities taking place on their premises." (Doc. 1 at 11)

### I. The Fair Housing Act Claim

Haynes alleges that the defendant violated three sections of the FHA.  First, Haynes alleges that, by refusing to regulate the men's pool tournaments organized by the Neighborhood Association, the defendant discriminated against Haynes "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" Haynes's sex.  42 U.S.C. § 3604(b).  Second, Haynes's alleges that, by requiring Haynes to sit at separate table at bingo night, the Neighborhood Association violated 42 U.S.C. § 3604(f)(2), which prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person."  Finally, 42 U.S.C. § 3604(c) prohibits "mak[ing], print[ing], or publish[ing], or caus[ing] to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that

- 9 -

indicates any preference, limitation, or discrimination based on . . . handicap, . . . or an intention to make any such preference, limitation, or discrimination." Haynes alleges that Sanchez uttered statements revealing a preference against handicapped tenants when he yelled at Haynes and instructed her to walk into the office to pay her rent.

### A. The Neighborhood Association Is Not an Agent of the Defendant

Haynes asserts that the defendant incurs vicarious liability for the Neighborhood Association's allegedly discriminating based on Haynes's gender and handicap. Although prohibiting certain acts of discrimination, the FHA "says nothing about vicarious liability." Meyer v. Holley, 537 U.S. 280, 285 (2003). However, "an action brought for compensation by a victim of housing discrimination is, in effect, a tort action, . . . [a]nd the Court has assumed that, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules . . . ." Meyer, 537 U.S. at 285. Accordingly, the defendant remains vicariously liable for the discrimination of the Neighborhood Association only if the Neighborhood Association was an agent acting within the scope of its authority. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Rainey v. Aware Woman Center for Choice, Inc., 224 F.3d 1266, 1268 (11th Cir. 2000) (quoting Restatement (Second) of Agency § 1(1) (1958)). Both the principal and the agent must consent to the agency; a mere association is insufficient. "[T]he person sought to be charged as a master [must have] 'the right or power to control and direct the physical conduct of the other in the performance of the act.' If there is no right to control, there is no liability." Wilson v. United States, 989 F.2d 953, 958-59 (8th Cir. 1993) (holding that a Boy Scout

tribal council incurred no liability for the tort of a troop leader because the tribal council neither consented to control nor actually controlled the actions of the troop leader).

Haynes utterly fails to present evidence of the defendant's control over the Neighborhood Association's pool tournaments and bingo nights. The record lacks evidence that either the Neighborhood Association or the defendant "manifested assent" to an agency relationship. Restatement (Third) of Agency § 1.01 (2006). Although the defendant advertises the Neighborhood Association's events, Haynes presents no evidence that the defendant scheduled, organized, or otherwise controlled any event of the Neighborhood Association. The mere fact that the organized events benefit the defendant's rental property fails to create an agency; mutual benefit alone remains insufficient. See, e.g., Restatement (Third) of Agency § 1.01 cmt. (g) (2006) ("In any relationship created by contract, the parties contemplate a benefit to be realized through the other party's performance. Performing a duty created by contract may well benefit the other party but the performance is that of an agent only if the elements of agency are present.").

Furthermore, the defendant's responses to the Haynes's lawyer's hypotheticals fail to establish the defendant's control over the events planned by the Neighborhood Association. Haynes may not establish the requisite control by citing the defendant's speculative response (elicited at a deposition after the onset of litigation) to the hypothetical and unlikely situation in which the Neighborhood Association organizes bungee jumping on the property. The defendant, as a landlord, might incur liability for the abnormally dangerous activity on the property irrespective of any agency between the Neighborhood Association and the defendant. And the defendant's desire to protect tenants and the Rice Creek property from dangerous or illegal activity fails to evidence

- 11 -

the defendant's "control" over the Neighborhood Association's bingo nights and pool tournaments. The only evidence of control is Bill Brimmer's request that the residents in charge of the bingo night "quit using staples to put their bingo papers together." The defendant's request that the Neighborhood Association cease leaving staples in the carpet of the clubhouse fails to show the requisite control over the bingo nights. The defendant's affidavits remain unrebutted; the defendant "has never had any involvement in the organizing or managing of the" bingo nights and pool tournaments at Rice Creek. Although an expansive statute, the FHA fails to create a federal claim requiring a landlord to intervene each time a tenant excludes his neighbor from a private dinner party, pool tournament, or bingo night.

<u>B. The Bingo Nights and Pool Tournaments Are Not Services<br>"in Connection with" the Sale or Rental of a Dwelling</u>

The FHA prohibits discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" Haynes's gender or handicap. The Department of Housing and Urban Development interprets the FHA to prohibit engaging "in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons." 24 C.F.R. § 100.70(b) (2010). The HUD regulations list the following examples:

> (1) Discharging or taking other adverse action against an employee, broker or agent because he or she refused to participate in a discriminatory housing practice.
>
> (2) Employing codes or other devices to segregate or reject applicants, purchasers or renters, refusing to take or to show listings of dwellings in certain areas because of race, color, religion, sex, handicap, familial status, or national origin, or refusing to deal with certain brokers or agents because they or one or more of their clients are of a particular race, color, religion, sex, handicap, familial status, or national origin.

- 12 -

> (3) Denying or delaying the processing of an application made by a purchaser or renter or refusing to approve such a person for occupancy in a cooperative or condominium dwelling because of race, color, religion, sex, handicap, familial status, or national origin.
>
> (4) Refusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance differently because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.70(d) (2010). The HUD regulations recognize that a refusal to provide water or electricity frustrates a tenant's ability to enjoy her dwelling. On the other hand, the defendant's failure to intervene in Haynes's dispute with her neighbors fails to create a claim for relief. Although Haynes understandably enjoys the weekly bingo night, neither her neighbors' excluding her nor the defendant's failure to prevent the exclusion constitutes a refusal to "provide services in connection with" the rental of Haynes's dwelling. Although Haynes's neighbors may refuse to associate with her, Haynes continues to enjoy unfettered access to her dwelling, to the billiards room and equipment (owned by the Neighborhood Association, not the defendant), and to all of the common areas at Rice Creek. "The FHA was passed to ensure fairness and equality in housing . . . not to become some all purpose civility code regulating conduct between neighbors." Gourlay v. Forest Lake Estates Civic Ass'n of Port Richie, Inc., 276 F. Supp. 2d 1222, 1232 n.14 (M.D. Fla. 2003). Accordingly, the defendant's motion for summary judgment is **GRANTED** with respect to Haynes's FHA claims arising from the alleged exclusion from the bingo nights and pool tournaments.

### C. The Confrontation with Sanchez

The FHA prohibits "mak[ing], print[ing], or publish[ing], or caus[ing] to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on

- 13 -

. . . handicap, . . . or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c).  "[T]o establish a prima facie claim under section 3604(c), [Haynes] must prove that: (1) defendants made a statement; (2) the statement was made with respect to the rental of a dwelling; and (3) the statement indicated a preference, limitation, or discrimination on the basis of [handicap]." Wentworth v. Hedson, 493 F. Supp. 2d 559, 565 (E.D.N.Y. 2007).  According to the HUD regulations, the statute covers "all written or oral notices or statements by a person engaged in the sale or rental of a dwelling."  24 C.F.R. § 100.75 (2010).  Haynes alleges that Sanchez uttered statements revealing a preference against handicapped tenants when he yelled at Haynes and instructed her to walk into the office to pay her rent.  The defendant argues that the claim fails because "Sanchez's statements do not show discrimination against handicap tenants, but Sanchez's frustration with Haynes. . . . [T]he content of Sanchez's statements convey Sanchez's disbelief in Haynes's allegation that she could not open the door, not a preference against handicap tenants."  (Doc. 23 at 15-16)

According to Haynes, Sanchez yelled, "I have seen you walk.  You can walk in this office if you want.  There's no reason you can't.  I know what handicapped or disabled is, and you're not. . . . There's no reason that you cannot come in here, and I will not open this door for you again."  (Doc. 25-1 at 7)  "Openly discriminatory oral statements merit . . . straightforward treatment."  Soules v. HUD, 967 F.2d 817, 824 (2d Cir. 1992).  A reasonable juror could conclude that Sanchez, while serving as the manager of Rice Creek, uttered a statement "indicating a preference" against a handicapped tenant who required assistance to enter the Rice Creek leasing office.  Although the defendant disputes Sanchez's motivation for the comments, Sanchez's motivation remains a question for the jury.  See Soules, 967 F.2d at 824 ("That statements are not facially

discriminatory, however, does not mean that they do not indicate an impermissible preference in the context in which they were made."). Accordingly, the defendant's motion for summary judgment is **DENIED** with respect to the FHA claim arising from Sanchez's alleged tirade.

## II. The American with Disabilities Act Claim

Haynes alleges in count two that the defendant violated the ADA (1) by refusing "to remove architectural barriers of non-handicap accessible doors" and (2) by refusing "to insure equal participation in RV Resort Activities taking place on their premises." In her response to the motion for summary judgment, Haynes "recognizes that [the defendant] did install automatic doors," and Haynes withdraws the request for an injunction requiring the defendant to install the electric doors. (Doc. 27 at 19) However, Haynes continues to pursue the claim for injunctive relief requiring the defendant "to insure equal participation in RV Resort Activities."

Haynes alleges that the defendant violated 42 U.S.C. § 12182(b)(2)(ii), which prohibits failing "to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." Haynes seeks an injunction requiring the defendant to "oversee the [Neighborhood] Association to ensure that the activities advertised are not being denied based on disability." (Doc. 27 at 19)

The ADA claim fails. Although a landlord must comply with the public accommodation requirements of the ADA (and cannot avoid ADA compliance merely by

leasing a public accommodation), the ADA does not require a landlord to ensure that a tenant (or a group of tenants) includes every neighbor at an event. A landlord incurs liability only if the landlord implements a discriminatory policy, practice, or procedure. Although describing a commercial lease, the "Section-by-Section Analysis and Response to Comments" for the ADA, 36 C.F.R. Pt. 36 App. B (published July 26, 1991), provides an instructive example of this limitation:

> [I]n general landlords should not be given responsibility for policies a tenant applies in operating its business, if such policies are solely those of the tenant. Thus, if a restaurant tenant discriminates by refusing to seat a patron, it would be the tenant, and not the landlord, who would be responsible, because the discriminatory policy is imposed solely by the tenant and not by the landlord. If, however, a tenant refuses to modify a "no pets" rule to allow service animals in its restaurant because the landlord mandates such a rule, then both the landlord and the tenant would be liable for violation of the ADA when a person with a service dog is refused entrance.

As described above, the Neighborhood Association—an unincorporated group of neighbors informally responsible for planning "events" at Rice Creek—is not an agent for the defendant. The defendant neither manages, nor organizes, nor supervises the events planned by the Neighborhood Association. The defendant neither implements nor enforces the Neighborhood Association's alleged "segregation" of handicapped bingo players by reserving a table at the front of the room. In other words, Haynes identifies no discriminatory policy, practice, or procedure of the defendant for which Haynes has requested an accommodation; a landlord need not police the private events of a tenant to ensure that all tenants enjoy equal access to every private event. Neither the FHA nor the ADA requires a landlord to intervene in a purely private dispute among tenants. Accordingly, the defendant's motion for summary judgment is **GRANTED** with respect to count two.

Conclusion

The defendant's motion (Doc. 23) for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** on both count two and on count one with respect to Haynes's FHA claims stemming from the Neighborhood Association's alleged discrimination at the billiards tournaments and bingo nights. The motion is **DENIED** with respect to Haynes's FHA claim stemming from Sanchez's alleged statement showing a preference against handicapped tenants. The parties' unopposed motions (Docs. 40 and 41) for a protective order are **GRANTED IN PART** to the extent that the trial of this matter is set for **1:30 P.M.** on **Monday, July 26, 2010**.

Finally, supplemental mediation apparently will assist the parties' resolution of this action. The parties are directed to engage in supplemental mediation with **Mary A. Lau, Esq.**, of Lau, Lane, Pieper, Conley & McCreadie, P.A., 100 South Ashley Drive, Suite 1700, Tampa, Florida 33602, (813) 229-2121. The mediation shall begin at **10:00 A.M.** on **Wednesday, July 14, 2010**. The provisions of the June 25, 2009, order (Doc. 14) referring this matter to mediation otherwise apply.

ORDERED in Tampa, Florida, on June 22, 2010.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE